HONORABLE RICHARD A. JONES

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

MOHAMMED SIDDIQUI,

9            Plaintiff,

10      v.

11   UNIVERSITY OF WASHINGTON, et al.,

12            Defendants.

13

CASE NO. C14-349RAJ

ORDER

14

## I.  INTRODUCTION

15      This matter comes before the court on Defendants' motion for summary judgment

16   and Plaintiff's motion for summary judgment on one of his claims.  No party requested

17   oral argument.  For the reasons stated herein, the court GRANTS Defendants' motion in

18   part and DENIES it in part.  Dkt. # 31.  The court DENIES Plaintiff's motion.  Dkt. # 27.

19   This order ends with instructions on preparing for trial.  Trial will begin April 27.

20                              ## II.  BACKGROUND

21      For more than 20 years, Plaintiff Mohammed Siddiqui, a native of India, was a

22   veterinary specialist at the Washington National Primate Research Center ("NPRC"), a

23   subsidiary of the University of Washington.  On October 29, 2012, Mr. Siddiqui injected

24   ketamine, an anesthetic, into an infant primate in preparation for a surgery.  Dr. Keith

25   Vogel, a veterinarian who has worked at the NPRC since the late 1990s, assisted in the

26   surgery.  Although the surgery was successful, the primate was slow to awaken

27   afterward.

28   ORDER – 1

**A.      The Overdose of the Primate and the Roles of Dr. Vogel, Dr. Hotchkiss, and Mr. Siddiqui**

Dr. Vogel reviewed the surgery log, which suggested that the ketamine dose had been 8 times the correct dose.  He contacted Mr. Siddiqui, who contended that he had given the correct dose.  Dr. Vogel then reviewed the drug log, which is a log showing all withdrawals from the bottle of ketamine from which Mr. Siddiqui withdrew the dose in question.  The initial entry for the dose in question showed 8 times the correct dose.  Mr. Siddiqui modified the entry to show a correct dose.  Mr. Siddiqui did not attempt to hide the change; he crossed out the first entry and initialed the new entry, consistent with NPRC procedures for correcting mistakes on drug logs.  Further investigation revealed that the bottle from which the ketamine was extracted, which Dr. Vogel believed should have had additional liquid in it if Mr. Siddiqui's assertions about the dosing were correct, was missing from the drug cabinet.  Dr. Vogel later discovered the empty bottle in a medication discard bin.  Dr. Vogel conferred with Dr. Charlotte Hotchkiss, who is ultimately responsible for the maintenance of drug logs at NPRC, who agreed that there should have been additional liquid in the bottle.

Dr. Vogel and Dr. Hotchkiss concluded that Mr. Siddiqui had administered an overdose of ketamine and, when confronted with the mistake, had not only falsely denied it, but had modified the drug log to make it appear to be consistent with his denial.

Mr. Siddiqui urges a different conclusion.  He contends that he gave the correct dose of ketamine.  He does not explain why both his entry on the surgery log and his initial entry on the drug log showed an overdose by a factor of 8.  He contends, however, that when Dr. Vogel initially questioned him, he examined the drug log, found that it contained inaccurate information (reflecting the overdose) and thus modified it in accordance with NPRC procedures.  He contends that the ketamine bottle was empty, and that any discrepancy between the recorded extractions on the drug log and the amount in the bottle is simply the result of ordinary inaccuracies that are often present in drug logs. For example, each withdrawal from the bottle results in some loss of fluid, because the

ORDER – 2

syringes used for withdrawal take up fluid in their needle tips and hubs that is not expelled when fluid is ejected from the syringe.

**B.     Director David Anderson Decides that Mr. Siddiqui Should No Longer Work at the NPRC.**

Dr. Vogel reported the alleged overdose incident to Dr. David Anderson, the Director of the NPRC.  Dr. Anderson conferred with both Dr. Vogel and Dr. Hotchkiss, neither of whom made any recommendation as to what should be done to Mr. Siddiqui.  No evidence contradicts Dr. Anderson's assertions that he made his decisions about the consequences of Mr. Siddiqui's actions without recommendations from anyone else.  Anderson depo. at 25-26.

On the morning of November 1, 2012, Mr. Siddiqui arrived at work to discover a note directing him to come immediately to Dr. Anderson's office.  The note suggested nothing about the purpose of the meeting.  Other than Dr. Vogel's discussion with Mr. Siddiqui about the overdose before Dr. Vogel examined the drug log, there is no evidence that Mr. Siddiqui was aware anyone suspected him of making false statements.  There is no evidence that he knew anyone had discovered the discrepancies in the drug log.  So far as the record reveals, Mr. Siddiqui had no reason to suspect he faced discipline when he received the note directing him to Dr. Anderson's office.

Dr. Anderson and Mr. Siddiqui were the only people who spoke at the meeting.  Dr. Vogel and Dr. Hotchkiss were present, but silent.  According to Dr. Anderson, he called the meeting because he was concerned about the overdose incident and its aftermath, but had not yet made up his mind about any consequences.  He wanted to hear Mr. Siddiqui's side of the story.  At the meeting, he told Mr. Siddiqui what Dr. Vogel and Dr. Hotchkiss had discovered, and asked him "if there were any alternative explanations he could bring forward that would provide another explanation for how all of these things could have happened . . . ."  Anderson depo. at 20.  Mr. Siddiqui provided no alternative explanation.  According to Mr. Siddiqui, Dr. Anderson opened the meeting by demanding

ORDER – 3

that Mr. Siddiqui resign because of the overdose and the falsification of the drug log.  Mr. Siddiqui denied both the overdose and improper alteration of the drug log, to no avail.

All evidence shows that Dr. Anderson made an independent assessment of the case against Mr. Siddiqui.  Dr. Vogel and Dr. Hotchkiss were responsible for relaying to him the objective facts:  the primate's slow recovery, the surgery log indicating an overdose of ketamine, Mr. Siddiqui's denial that he had given an overdose, the alteration of the drug log, and the absence of fluid in the ketamine bottle.  Dr. Anderson's testimony leaves no doubt that he drew his own conclusions from those facts.  He knew from his own clinical experience that the primate's recovery was exceptionally slow, which suggested an overdose.  Anderson depo. 38-44.  He knew that the surgery log showed an overdose.  He was aware of no other explanation for the primate's slow recovery, and Mr. Siddiqui offered none.  He knew that Mr. Siddiqui had denied the overdose nonetheless.  He knew from his clinical experience that ordinary drug loss could not account for the discrepancy between amount of ketamine that should have been in the bottle and Mr. Siddiqui's assertion that the bottle was empty.  Anderson depo. 47-48, 53.  Based on all of this information, he concluded that Mr. Siddiqui overdosed the primate, lied about it, and falsified records to cover up his mistake.  He decided, without advice or recommendation from anyone, that Mr. Siddiqui's employment at the NPRC must end.  There is no dispute that, assuming the accuracy of the conclusions that Dr. Anderson drew, Mr. Siddiqui had committed misconduct for which termination was appropriate.

**C.**   **Dr. Anderson Offers Mr. Siddiqui the Option to Resign in Lieu of Termination or Termination Proceedings.**

The evidence is conflicted as to what happened next at the November 1 meeting.  According to Dr. Anderson, he knew that he could not terminate Mr. Siddiqui on his own, because a host of University procedures and state regulations dictated a termination process in which his recommendation to terminate was merely the first step.  He told Mr. Siddiqui that he would initiate the termination process.  Anderson depo. 32-33.  As an

ORDER – 4

alternative, he offered Mr. Siddiqui the opportunity to resign. *Id.* Other than informing Mr. Siddiqui that a termination would likely make him ineligible for re-employment at the University, he did not give Mr. Siddiqui information about the advantages and disadvantages of electing resignation over a termination process. He asked Mr. Siddiqui to make a decision by the following morning. *Id.* at 142. According to Dr. Anderson, Mr. Siddiqui did not ask for the opportunity to provide documents to prove his version of the overdose and its aftermath. *Id.* at 141. He did not ask to speak with an attorney or anyone else. *Id.* He did not ask for more time to make his decision. *Id.*

Mr. Siddiqui's version[1] of the November 1 meeting is different. As the court has noted, he contends that Dr. Anderson immediately announced his conclusions about the overdose and Mr. Siddiqui's role and demanded his resignation. He did not listen to Mr. Siddiqui's protestations that he was drawing the wrong conclusions. Mr. Siddiqui asked Dr. Anderson for a warning and a second chance, but Dr. Anderson did not reply. *Id.* at 197, 199, 226. He testified that he explained to Dr. Anderson that the alteration of the drug log was not dishonest, but to no avail. *Id.* at 225. Mr. Siddiqui asked to get legal advice, and Dr. Anderson said that he would fire him if he did not resign. Mr. Siddiqui chose to resign. Dr. Anderson told him to write a resignation letter, turn in his keys, and leave the building. Mr. Siddiqui denied at his deposition that Dr. Anderson offered him any benefit as an incentive to resign. Siddiqui depo. at 46-47. In a declaration he filed earlier in this case, he stated that Dr. Anderson told him that "a permanent record would be made of [his] deficient health care services and the only way to avoid that permanent record was to resign effective immediately," and that he believed that if he did not resign, "Dr. Anderson would interfere in [his] job search." Siddiqui Decl. (Dkt. # 15) ¶ 1.

A jury could believe Mr. Siddiqui's version of events, and it could also draw two inferences that are critical to the court's decision today. First, a jury could infer that Dr.

---

[1] Mr. Siddiqui repeated his version of events at least three times in his deposition. Siddiqui depo. at 31-35, 138-42, 224-26.

ORDER – 5

Anderson required Mr. Siddiqui to decide to resign during the meeting or termination proceedings would begin immediately.  Second, a jury could infer that Dr. Anderson represented, falsely, that he would and could actually fire him, as opposed to merely making the recommendation that would start a termination process and placing him on administrative leave pending the outcome of that process.  Siddiqui depo. at 144-45, 47.  A jury could believe that Dr. Anderson told Mr. Siddiqui that his "choice" was either to resign or to be immediately fired without recourse.

What is not in dispute is that shortly after leaving Dr. Anderson's office, Mr. Siddiqui sent him a one-sentence email declaring that he was resigning "effective immediately[,] due to personal reasons."  Augenthaler Decl. (Dkt. # 35), Ex. A.  More than three months later, he attempted without success to rescind his resignation.

**D.     Mr. Siddiqui Sues Dr. Anderson, Dr. Vogel, and the University; His Remaining Claims are for Denial of Procedural Due Process and Race Discrimination.**

Mr. Siddiqui sued Dr. Anderson, Dr. Vogel, and the University.  He contends that Dr. Vogel and Dr. Anderson violated 42 U.S.C. § 1983 by denying him procedural protections guaranteed him by the Due Process Clause and by discriminating against him on the basis of his race or national origin in violation of the Equal Protection Clause.  He contends that all three Defendants are liable for violating the Washington Law Against Discrimination ("WLAD") by discriminating against him on the basis of his race or national origin.  Faced with Defendants' motion for summary judgment on all his claims, Mr. Siddiqui conceded that he would not pursue "State law claims of age or reprisal discrimination or 'class of one' minimum scrutiny Equal Protection."  Pltf.'s Opp'n (Dkt. # 38) at 21 n.18.  Mr. Siddiqui also filed his own summary judgment motion, asserting that Dr. Anderson is liable as a matter of law for depriving him of his due process rights.

The court now considers Mr. Siddiqui's due process claim, his WLAD claim, and his equal protection claim.

ORDER – 6

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

**A.    Although Mr. Siddiqui's Resignation Presumptively Relinquished His Due Process Rights, A Jury Must Decide Whether the Resignation Was the Product of Coercion or Misrepresentation.**

When state law gives a state employee a "legitimate claim to continued employment absent sufficient cause for discharge," the employee "may demand the procedural protections of due process" that the Fourteenth Amendment guarantees.  *Goss v. Lopez*, 419 U.S. 565, 573 (1975); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-43 (1985) (discussing Due Process Clause protections applicable to public employees).  There is no dispute, for purposes of these motions, that Mr. Siddiqui was, until November 1, 2012, an employee of the State of Washington who could be dismissed only for cause and only after the University satisfied a series of procedural steps.

What the parties dispute is whether Mr. Siddiqui forfeited his procedural protections by resigning.  When an employee resigns, he voluntarily relinquishes the property interest that the Due Process Clause protects.  *See Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).  Nonetheless, a "resignation may be

ORDER – 7

involuntary and constitute a deprivation of property for purposes of a due process claim" in some circumstances. *Id.* at 941. When an employee resigns because of "intolerable working conditions," *id.* at 940, or coercion, *id.* at 941, he does not give up his due process rights. In addition, "where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee," the employee retains his due process rights. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995). Mr. Siddiqui contends that Dr. Anderson obtained his resignation with both coercion and misrepresentations.[2]

### 1. Coerced Resignation

Mr. Siddiqui's claim that Dr. Anderson coerced his resignation gives him the burden to "come forward with sufficient evidence to demonstrate that 'a reasonable person in [his] position would feel he had no choice but to retire'" or resign. *Knappenberger*, 566 F.3d at 941 (quoting *Kalvinskas v. Cal. Inst. of Tech.*, 96 F.3d 1305, 1308 (9th Cir. 1996)). Several factors, none of which are dispositive, govern the court's inquiry into whether a resignation was the product of coercion:

> In evaluating such claims of coercion, we determine voluntariness by an objective standard, rather than by the employee's purely subjective evaluation; reject cases in which the employee did have a choice, even if between comparatively unpleasant alternatives; and consider additional case-specific factors that cut against a finding of coercion, such as whether the employee was given an alternative to resignation or retirement, understood the choice, had a reasonable time in which to decide, or could select the timing of the retirement or resignation.

*Id.* at 941. The *Knappenberger* factors, and the cases from which those factors are taken, assess both inherent and procedural coercion. Inherent coercion is the coercive force inherent in the choice facing the employee. Procedural coercion is the coercive force arising from the manner in which the employer forces the employee to make that choice.

---

[2] Mr. Siddiqui offers neither evidence nor argument that Dr. Vogel is liable for depriving him of his due process rights. He could not do so successfully in any event, given undisputed evidence that Dr. Anderson alone made the decisions that impacted Mr. Siddiqui's due process rights.

ORDER – 8

A choice is inherently coercive where it is a "choice" in name only. The *Knappenberger* court pointed to the employee's "choice" in *Kalvinskas* as an example. That case, which considered whether an retirement decision was voluntary for purposes of an Age Discrimination in Employment Act prohibition on involuntary age-based retirement, concerned a university scientist who was receiving long-term disability benefits. *Kalvinskas*, 96 F.3d at 1306-07. When the scientist reached retirement age, the university informed him that it would offset his disability benefits by the amount of retirement benefits he was entitled to receive, effectively reducing his income to zero. *Id.* at 1307. The employee's "choice," therefore, was to remain unretired and receive no income at all, or retire and receive a retirement income essentially equal to the long-term disability benefits he had been receiving. *Id.* The court concluded that a "reasonable person in [the scientist]'s position would feel he had no choice but to retire," and that his decision was therefore involuntary. *Id.* at 1308.

The *Knappenberger* court contrasted the coerced retirement in *Kalvinskas* to the retirement decision of the plaintiff before it, a police officer facing allegations that he had sexually harassed another officer. 566 F.3d at 939. The officer realized that there was a possibility that he would be terminated because of those allegations, which would make him unable to retire, and thus deprive him of the lifetime health insurance that came with retirement. *Id.* The officer elected to retire early. *Id.* The court found no coercion, characterizing the choice between possible termination and loss of health insurance and early retirement with benefits as a "choice between two unpleasant alternatives," that was not, by itself, coercive. *Id.* at 941. The court observed that the police department did not demand the officer's resignation, did not "tell him he would be terminated," and did not require him "to make an on-the-spot decision." *Id.* (noting that plaintiff "does not even allege that a termination would have been inevitable"). In addition, the officer was permitted to choose the date of his resignation. *Id. Knappenberger* stands for the

ORDER – 9

proposition that a resignation is voluntary where it does not follow an inherently coercive "choice" and bears none of the hallmarks of procedural coercion.

Another indication of inherent coercion is the threat of consequences that reach beyond a plaintiff's employment. In *Angarita v. County of St. Louis*, 981 F.2d 1537, 1540 (8th Cir. 1992), the court considered the resignations of three police officers accused of a wide range of serious misconduct. The police department obtained those resignations by threatening the officers not only with termination, but with criminal prosecution. *Id.* at 1541, 1543. The department also threatened to reveal sexual improprieties to the public or directly to some of the officers' families. *Id.* at 1541-43 & n.9. Those threats were among the many reasons that the court upheld a jury's verdict that the resignations were involuntary. *Id.* at 1545 ("There was absolutely no choice. In fact, the only alternative presented was that they could continue to refuse to give in to the high pressure and permit their families to be contacted, to be placed in jail and fired, and to be publicly embarrassed in the media."). Threats of non-employment consequences, however, are not necessarily sufficient by themselves to prove coercion. In *Hargray*, the court found no coercion even though a city employee faced the choice between resigning in the face of accusations that he had stolen from his employer or termination and criminal charges based on those accusations. 57 F.3d at 1569.

*Hargray* and *Angarita* also illustrate procedural coercion. *Angarita* does so to the extreme. There, the police department summoned three officers to a police station, took away their guns, badges, and employee identification cards, and led them away to individual interrogation rooms after a supervisor told interrogators in the officers' presence to "book them all." *Id.* at 1541. Interrogators told each officer that there was no chance that he would leave the room with his job. *Id.* at 1541-43. They told each officer that he could not speak to an attorney, a supervisor, or anyone else. *Id.* Interrogators used tape recorders, but turned them off and on intermittently, often so that they could make threats without recording them. *Id.* The interrogations lasted for hours. *Id.* at

ORDER – 10

1545.  Each officer resigned before he left the room.  *Id.* at 1541-43.  This "high pressure," coupled with the threats of consequences beyond the officers' employment, was sufficient evidence to sustain a jury's verdict that their "resignations were involuntarily extracted."  *Id.* at 1545.  In *Hargray*, by contrast, the court reversed a district court who found (following a bench trial) that a city forced its employee to resign. Unlike the plaintiffs in *Angarita*, the plaintiff in *Hargray* knew before he met with police that he faced accusations of theft that could lead to his termination, and that it was possible that he would face criminal charges.  57 F.3d at 1569.  He also knew before the meeting that he would have the chance to resign to avoid criminal charges.  *Id.*  Once he came to the meeting, he was free to leave at any time.  *Id.* at 1566.  The police officials who conducted the meeting told him that the city wanted his resignation before he left the police station, but they told him he was free to make a phone call.  *Id.*  Given these circumstances, the court concluded that the employee's decision to resign shortly after the meeting concluded was voluntary.  *Id.* at 1566, 1569-70.

a.    **If a Jury Believes Mr. Siddiqui's Account of the November 1 Meeting, His Resignation Was Coerced.**

In applying the lessons of *Knappenberger*, *Kalvinskas*, *Angarita*, and *Hargray* in the context of Defendants' motion for summary judgment, the court must rely on Mr. Siddiqui's account of the November 1 meeting.  As the court has explained, that means it must assume that Dr. Anderson told Mr. Siddiqui that he would immediately fire him without recourse if he did not resign, declined Mr. Siddiqui's requests to speak to a legal advisor (or to anyone else), and required Mr. Siddiqui to decide whether he would resign before he left the meeting.

If a jury accepts Mr. Siddiqui's version of the November 1 meeting, then his resignation was the result of procedural coercion.  Unlike the plaintiff in *Hargray*, there is no evidence that Mr. Siddiqui knew that he faced discipline when he came to the November 1 meeting, much less that he would face the choice between termination and

ORDER – 11

resignation.  He thus had no opportunity to consider his alternatives before the meeting.
By his account, he also had no opportunity to consider his alternatives during the meeting
or after.  Moreover, Dr. Anderson denied him the opportunity to speak with an attorney
or anyone else.  Unlike the plaintiff in *Knappenberger*, Mr. Siddiqui "was required to
make an on-the-spot decision."  566 F.3d at 941.

If a jury accepts Mr. Siddiqui's assertion that Dr. Anderson told him he would be
fired immediately and without recourse, then a jury could conclude that his resignation
was the result of inherent coercion.  In that version of events, the "choice" before Mr.
Siddiqui was to lose his job immediately with no recourse or to resign and receive, at
most, slightly improved prospects for finding a new job.  In that version of events, his
termination was not merely a possibility (as it was in *Knappenberger* and *Hargray*), it
was a fait accompli.  This was not merely a difficult choice (like the choice in
*Knappenberger* between fighting termination proceedings and possibly losing lifetime
medical benefits or resigning and guaranteeing those benefits), it is possible that it was a
"choice" that "deprived [him] of free will in choosing to re[sign]."  566 F.3d at 936.

### b.   If a Jury Believes Dr. Anderson's Account of the November 1 Meeting, Mr. Siddiqui's Resignation Was Not Coerced.

Because Mr. Siddiqui has also requested summary judgment on his due process
claim, the court must also consider the November 1 meeting in the light most favorable to
Dr. Anderson.  From that perspective, there was no inherent coercion.  The choice that
Dr. Anderson says he offered, between the immediate initiation of a termination process
and resigning, is not inherently coercive.  The plaintiff in *Knappenberger* faced a choice
more weighted in favor of resignation.  There, not retiring meant that the plaintiff risked
not only the loss of his wage income (like Mr. Siddiqui), but the loss of significant
retirement benefits. But that risk was offset by the prospect of successfully fighting his
termination and retaining both his income and his retirement benefits.  Like the plaintiff
in *Knappenberger*, Mr. Siddiqui faced the choice (by Dr. Anderson's account) between

ORDER – 12

two inherently unpleasant alternatives, he did not face a choice that was inherently coercive.

Dr. Anderson's account of events is also fatal to Mr. Siddiqui's assertion of procedural coercion. Dr. Anderson told Mr. Siddiqui he could evaluate his options and deliver his decision the following morning. That would have given Mr. Siddiqui an adequate opportunity to consult an attorney, another person, or any external sources of information. He could, for example, have verified what due process protections were available to him. That Mr. Siddiqui did not take advantage of those opportunities is not Dr. Anderson's fault.

### 2.      Resignation Induced by Misrepresentation

Courts have acknowledged that a resignation induced by an employer's misrepresentations is, like a coerced resignation, insufficient to waive due process protections. *See Hargray*, 57 F.3d at 1570 (citing cases). The Ninth Circuit has not, so far as the court is aware, acknowledged this "misrepresentation theory," *id.*, but the court assumes that it would, given its favorable discussion of *Hargray* in *Knappenberger*. The misrepresentation theory applies where the employer misrepresents facts relevant to an employee's choice to resign, the employee reasonably relies on that misrepresentation, and the reliance induces the employee's resignation. *Hargray*, 57 F.3d at 1570. In *Hargray*, the court considered (and rejected) the possibility that the city misled its employee when it stated that he would be criminally prosecuted if he did not resign.

As the court has discussed, a jury who believes Mr. Siddiqui's version of events could infer that Dr. Anderson misled him about his power to fire him. If Mr. Siddiqui believed that he must either resign or be terminated immediately and without recourse, a jury could conclude that Dr. Anderson's misrepresentation induced his resignation. On the other hand, a jury who believes Dr. Anderson's account of the November 1 meeting could not reach that conclusion. Dr. Anderson testified that he informed Mr. Siddiqui that he could only recommend his termination, thereby initiating an administrative

ORDER – 13

process. That was not a misrepresentation. Even if there was a misrepresentation, a jury might conclude that Dr. Anderson gave Mr. Siddiqui sufficient time to learn facts that would dispel that misrepresentation.

Although he could not make affirmative misstatements, Dr. Anderson had no affirmative duty to inform Mr. Siddiqui of his due process rights. The court is aware of no binding authority requiring an employer to volunteer information about subsequent administrative proceedings when requesting an employee's resignation. The court is aware of only one circuit court decision suggesting that an employer has an affirmative duty to inform an employee about his due process rights. *Covington v. Dep't of Health & Human Servs.*, 750 F.2d 937, 943 (Fed. Cir. 1984) (considering agency's omissions as evidence of denial of procedural rights). But *Covington* considered an employee subject to federal civil service protections, rather than the lesser protections of the Due Process Clause. In any event, the Ninth Circuit has not adopted similar reasoning as applied to the Due Process Clause. To put it another way, there is no *Miranda* warning required before requesting an employee's resignation in lieu of termination. An employee invoking the misrepresentation theory must point to an affirmative misrepresentation that caused his resignation.

**B.     If the Due Process Clause Placed Limits on Dr. Anderson's Authority to Propose Resignation in Lieu of Termination, He Acted Within Those Limits as a Matter of Law.**

Before moving on to Mr. Siddiqui's discrimination claim, the court addresses the parties' dispute over whether Mr. Siddiqui actually overdosed the primate and falsified the drug log to cover his error. The parties have expended much ink and much discovery on that dispute, but neither the court nor the jury will resolve it. Instead, the court rules that the objective evidence that Dr. Anderson reviewed gave him a reasonable basis to conclude that Mr. Siddiqui had overdosed the primate and falsified records. No jury could conclude otherwise. A jury might conclude that Mr. Siddiqui's explanation about the alleged overdose and altered drug log is more persuasive than Dr. Anderson's,

ORDER – 14

although the court in no way suggests that this is likely.  Even if Mr. Siddiqui could persuade the jury that he did nothing wrong, it would not impact the outcome of this case. What matters to Mr. Siddiqui's due process claim is that for all the reasons the court stated in Part II.B, *supra*, Dr. Anderson had an objective basis to reach his conclusions. For two reasons, the court concludes that the Due Process Clause requires no more.

First, some courts have held that an employer must have reason to believe that an employee will face adverse consequences before threatening the employee with those consequences and offering the choice of resignation.  In *Hargray*, for example, the court noted that the "one exception" to the rule that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges," is "where the employer lack[s] good cause to believe that grounds for termination and the criminal charges exist[]."  57 F.3d at 1568.  The court assumes that the Ninth Circuit would recognize the same exception.  To rule otherwise would encourage employers to attempt to bypass due process protections on flimsy grounds. Here, Dr. Anderson had good cause, as a matter of law, to conclude that Mr. Siddiqui was subject to termination.

Second, Mr. Siddiqui frequently makes due-process-like arguments as to Dr. Anderson's conduct in the November 1 meeting.  He suggests that Dr. Anderson did not listen to his side of the story, did not reveal what evidence he had considered, did not allow Mr. Siddiqui to question that evidence or present his own, and made up his mind before the meeting began.  He cites Washington public employment regulations and the University's internal procedural requirements as if he assumes that those rules apply even when an employer offers a choice between resignation and a termination process.  There is no indication that his assumption is correct.  The Due Process Clause (and perhaps the state and University rules he cites) gives him the right to review the evidence against him, the right to introduce his own evidence, and the right to plead his version of events to an impartial decisionmaker.  By contrast, the meeting he attended was an opportunity for

ORDER – 15

him to decide whether to invoke his procedural rights or to resign.  To the extent that the Due Process Clause imposes any limits on that meeting, they are subsumed in the requirement that the employer have good cause to believe the employee's conduct warrants termination and the requirement that the employee not be coerced or misled as he chooses between his Due Process rights and resignation.

Put another way, the only due process question the jury will resolve at trial is whether Mr. Siddiqui relinquished his Due Process rights and procedural protections. Assuming that he did, the court rules as a matter of law that no procedural protections apply other than those inherent in the inquiry into whether his resignation was the product of coercion or misrepresentation.

**C.     Dr. Anderson Has Not Established A Complete Qualified Immunity Defense.**

Dr. Anderson raises the defense of qualified immunity, which permits a defendant facing a § 1983 lawsuit to avoid liability for damages "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Dr. Anderson contends that no reasonable person in his position would have known that it was unlawful to rely on the evidence he reviewed as a basis for forcing Mr. Siddiqui to choose between resignation and termination proceedings.  Defs.' Mot. (Dkt. # 31) at 14-16; Defs.' Opp'n (Dkt. # 33) at 15-17.  In his reply brief, he added an argument that no clearly established law would have put him on notice that he faced liability for omitting more description of the University's termination process (as opposed to affirmatively misrepresenting that process).  Defs.' Reply (Dkt. # 39) at 7.  Both arguments are correct, but he does not address other questions on which his assertion of qualified immunity depends.  One of those questions is whether clearly established law would have put a reasonable person on notice that he could not force Mr. Siddiqui to make the choice between termination proceedings and resignation without giving him time to consider his alternatives and consult outsiders.  Another is whether clearly established law informed him that he could

ORDER – 16

not misrepresent his power to fire Mr. Siddiqui.  Dr. Anderson makes no argument

addressing either question, and the court declines to answer them sua sponte.

## D.    Defendants Did Not Violate the WLAD.

The WLAD prohibits employers from discriminating against employees because

of race or national origin (among other prohibited classifications).  RCW 49.60.180(3).

A plaintiff claiming that he suffered an adverse employment action because of his race

can avoid summary judgment with either direct or circumstantial evidence that race was a

substantial factor in that action.  *See Scrivener v. Clark College*, 334 P.3d 541, 545-46

(Wash. 2014).  Direct evidence includes "discriminatory statements" and other evidence

of discriminatory motive.  *Fulton v. Dep't of Soc. & Health Servs.*, 279 P.3d 500, 507

n.17 (Wash. Ct. App. 2012).[3]

Mr. Siddiqui points to no direct evidence of discrimination from the more than 20

years he worked at the University.  He admits that he had little substantive interaction

with Dr. Anderson over the course of his employment.  Siddiqui depo. at 30.  He does not

argue that Dr. Anderson had a racial bias; he instead contends that he was the unwitting

agent of Dr. Vogel's racial bias.  *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194

(2011) (discussing "cat's-paw liability" arising when a supervisor performs an act

motivated by bias that is intended to cause an adverse employment action).  As to Dr.

Vogel, he worked alongside Mr. Siddiqui for more than a decade.  In all of those years,

Mr. Siddiqui points to just one incident of racial discrimination.  He contends that Dr.

Vogel's investigation into the overdose and his decision to report his findings to Dr.

Vogel was motivated by bias.  Mr. Siddiqui has no direct evidence to support that

contention.  Instead, he points to evidence from after his resignation, and contends that

the jury could conclude that bias motivated Dr. Vogel's investigation of the overdose.

---

[3] Mr. Siddiqui does not invoke the burden-shifting analysis first adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Indeed, he disavows its application to his case.  Pltf.'s Opp'n (Dkt. # 38) at 15 n.14.  The court follows his lead, but notes that he would have fared no better in avoiding summary judgment if he had invoked *McDonnell Douglas*.

ORDER – 17

The direct evidence to which Mr. Siddiqui points is flawed, to say the least. In February 2014, it appears that Mr. Siddiqui or someone acting on his behalf commissioned a third party to pose as a prospective employer or job-placement service and contact Dr. Vogel by telephone. It appears that the third party asked Dr. Vogel various questions, then made notes of Dr. Vogel's responses. Those notes are embodied in a three-page document. That document (which the court will call the "Performance Evaluation") is in the record, but it is appended to an "expert report" that does not explain the provenance of the document. Jacobsen Decl. (Dkt. # 28), Appx. 20. Mr. Siddiqui offers no evidence from the person who created the Performance Evaluation and no evidence about the circumstances of its creation. Defendants correctly point out that the Performance Evaluation is inadmissible hearsay. The court could exclude the document (and Dr. Vogel's testimony about it) on the same basis, but it is unnecessary to do so.

The Performance Evaluation reflects Dr. Vogel's evaluation of Mr. Siddiqui's interpersonal skills in the workplace, his technical skills, his integrity, and more. The evaluation was mixed; Dr. Vogel identified both strengths and weaknesses. Most of his assessments were facially race-neutral, but a few of them raise questions. When asked to evaluate Mr. Siddiqui's relations with other employees, he stated that he had "problems with younger women and men," and that while he was not "nasty," there was a "cultural gap" between him and "twenty year olds [sic] that just got out of college." He also noted that English was not Mr. Siddiqui's first language, and that whereas he was "not saying [that] he didn't speak really really good English," it was "more of a mental approach." When asked to evaluate Mr. Siddiqui's integrity, he responded as follows:

> It was excellent but I think it was cultural that he did not want to be exposed to making a mistake. He would try to do everything very well and if he made a mistake, he would become defensive. If it was made in front of everybody, he owned up to it. If nobody was around, he would prefer not to have anyone know about it and we have people who do that but you have to tell someone immediately. I would say he was honest but would like to bury anything without witnesses.

ORDER – 18

There are no explicit remarks indicating an awareness of Mr. Siddiqui's race or "culture" in the remainder of the Performance Evaluation.

Viewed in the light most favorable to Mr. Siddiqui, Dr. Vogel's statements in the Performance Evaluation reveal that he harbored beliefs about Mr. Siddiqui's job skills that were tied to assumptions about Mr. Siddiqui's "culture." Dr. Vogel testified that his comments were not about race or national origin, but rather about a gap between Mr. Siddiqui and the NPRC's younger employees. Nonetheless, a jury could conclude that those are beliefs based on race or national origin. Moreover, a jury could conclude that Dr. Vogel harbored the same beliefs when Mr. Siddiqui was still working at the NPRC.[4] This ruling makes it unnecessary to consider Mr. Siddiqui's "expert report," which opines that the Performance Evaluation is evidence of racial bias. That excuses the court from considering Defendants' objections to the report.

It is not enough for Mr. Siddiqui to point to evidence of racial bias; he must also provide evidence from which a jury could conclude that bias was a substantial factor in an adverse employment action. Defendants attempt to avoid that issue by contending that Mr. Siddiqui resigned and that resignation is not an adverse employment action. They miss the point. Mr. Siddiqui was (at a minimum) required to choose between resignation or a termination process because of Dr. Anderson's conclusions about his misconduct. Merely forcing an employee to make choice is an adverse employment action.

There is no evidence, direct or circumstantial, that bias motivated Dr. Anderson's decision. As the court explained in Part II.B, *supra*, he drew independent conclusions based on objective evidence. Dr. Vogel did not recommend any course of action. Dr.

---

[4] Defendants contend that the court may not consider evidence of what Dr. Vogel said in February 2014 because of the immunity that RCW 4.24.730 affords to employers who disclose information about an employee to a prospective employer. Defendants would be correct if Mr. Siddiqui was attempting to impose civil liability upon Dr. Vogel for what he said in February 2014. There is no indication that he is doing so. Instead, he invokes Dr. Vogel's February 2014 statements as evidence of his racial animus while Mr. Siddiqui still worked at the NPRC. RCW 4.24.730 makes an employer "immune from civil and criminal liability" for job reference disclosures, subject to some limitations. It does not create an evidentiary privilege permitting an employer to bar the use of evidence of those disclosures for other purposes.

ORDER – 19

Anderson decided Mr. Siddiqui's fate.  Under these circumstances, it is likely that Dr. Anderson's judgment, rather than Dr. Vogel's input, was the proximate cause of Mr. Siddiqui's adverse employment action.  But even if was not, Mr. Siddiqui cannot prove that Dr. Vogel's bias was a substantial factor in Dr. Anderson's decision unless he can prove that bias was a substantial factor in causing Dr. Anderson to consider that objective evidence.  The first obstacle to doing so is that Dr. Vogel was not the only source of that evidence.  Dr. Hotchkiss confirmed all or nearly all of Dr. Vogel's assessments, and there is no evidence that she harbored a racial bias.

But even if the jury could ignore Dr. Hotchkiss's role, there is no evidence permitting the conclusion that racial bias was a substantial factor in Dr. Vogel's investigation of the overdose or his decision to report the results of that investigation.  Dr. Vogel was confronted both with a primate who was slow to awaken from surgery and a surgery log that revealed an overdose of ketamine.  No jury could conclude that racial animus was a substantial factor in his decision to investigate further.  He questioned Mr. Siddiqui not because of racial bias, but because Mr. Siddiqui was the person who administered the ketamine dose.  He examined the drug log because it was one of only two documents evidencing the size of that dose.  Only by impermissible speculation could a jury conclude that race, rather than a genuine desire to investigate the circumstances that put the primate's health at risk, was a substantial factor motivating the investigation.

The court rules that Mr. Siddiqui cannot prove race or national origin discrimination as a matter of law.  There is no evidence to contradict Dr. Vogel's testimony that he did not recommend any course of action to Dr. Anderson.  To connect Dr. Vogel's racial stereotypes to Mr. Siddiqui's injury, a jury would have to conclude that Dr. Vogel would not have relayed the objective facts surrounding the primate overdose to Dr. Anderson but for those stereotypes.  There is no evidence from which the jury could reach that conclusion.

ORDER – 20

**E.      Defendants Did Not Violate the Equal Protection Clause.**

Defendants contend that Mr. Siddiqui abandoned his § 1983 claim invoking the Equal Protection Clause.  They are mistaken.  He abandoned only his "'class of one' minimum scrutiny Equal Protection" claim.  Pltf.'s Opp'n (Dkt. # 38) at 21 n.18.  A "class of one" claim is an Equal Protection claim based on an adverse action motivated by a consideration other than membership in an "identifiable group."  *Engquist v. Or. Dep't of Agriculture*, 553 U.S. 591, 601 (2008).  Rather than point to an action motivated by the perceived characteristics of a group to which he belongs, a class-of-one plaintiff simply argues that he has been "irrationally singled out."  *Id.*  The *Engquist* Court reasoned that the class-of-one approach is "a poor fit in the public employment context." *Id.* at 605.  It held that a public employee cannot bring a class-of-one claim.  *Id.* at 609 ("Public employees typically have a variety of protections from just the sort of [arbitrary] personnel actions about which [plaintiff] complains, but the Equal Protection Clause is not one of them.").  Defendants mistakenly conflated Mr. Siddiqui's abandonment of any class-of-one claim as an abandonment of his Equal Protection claim based on his race and national origin.  That is not a class-of-one claim.  *See*, *e.g.*, *Thomas v. City of Beaverton*, 379 F.3d 802, 812-13 (9th Cir. 2004) (considering an equal protection claim from a public employee who contended that a "racially discriminatory purpose" was behind an adverse employment action).

Although Mr. Siddiqui did not abandon his equal protection claim, that claim fails as a matter of law for the same reasons that his WLAD claim fails.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (noting that the "purposeful-discrimination" of an employees' § 1983 equal protection claim "is the same as the purposeful-discrimination element of his Title VII claim).  Mr. Siddiqui offers neither argument nor authority that his Equal Protection claim could succeed where his WLAD claim fails.

ORDER – 21

## IV.  CONCLUSION

For the reasons previously stated, the court GRANTS Defendants' motion for summary judgment in part and DENIES it in part.  Dkt. # 31.  The court DENIES Plaintiff's motion for summary judgment on his due process claim.  Dkt. # 27.

Today's ruling leaves just one claim for trial against just one Defendant:  Mr. Siddiqui's § 1983 claim that Dr. Anderson deprived him of procedural due process by coercing his resignation or inducing his resignation by misrepresentation.

Before the parties file their pretrial submissions, they shall meet and confer to discuss how trial should proceed.  The court's intention is to bifurcate the trial.  In the first phase, a jury will decide whether Mr. Siddiqui's resignation was the product of misrepresentation or coercion.  If the jury decides that it was not, there is no need for a second phase.  If the jury decides that Mr. Siddiqui resigned because of coercion or representation, the same jury will hear a second phase of the trial devoted to Mr. Siddiqui's damages.  The parties shall meet and confer to discuss this proposed bifurcation.  No later than March 26, they shall submit a joint statement in which they either consent to bifurcation or succinctly state their objections to bifurcation.

The parties need not file their motions in limine until April 2.  All other deadlines remain as stated in the court's previous scheduling orders.

DATED this 18th day of March, 2015.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 22